UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTOPHER DREYER,<br><br>              Plaintiff,<br><br>      v.<br><br>UNITED STATES OF AMERICA,<br><br>             Defendant. | No. CV 22-1254 PA (KKx)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

AND RELATED COUNTERCLAIM

Plaintiff Kristopher Dreyer ("Plaintiff" or "Dreyer") commenced this action on July 19, 2022. Plaintiff's Complaint alleges a single claim for refund of "overpaid federal taxes" against defendant United States of America ("United States"). (Docket No. 1.) The Complaint alleges that the Internal Revenue Service ("IRS") erroneously assessed tax penalties against Plaintiff under 26 U.S.C. § 6672 for Riverside Christian Schools' ("RCS") failure to pay the trust fund portion of its payroll taxes for the fourth quarter of 2017 and first and second quarters of 2018. Plaintiff paid small portions of the trust fund penalties and then filed claims for refunds with the IRS.

The United States filed a Counterclaim in this action, seeking a judgment against Plaintiff for the total amount of the remaining trust fund penalties, plus interest and statutory additions that continue to accrue as a matter of law. (Docket No. 18.) The total balance of

the trust fund penalties assessed against Plaintiff, plus interest, as of August 8, 2023, was $187,900.12.

On June 26, 2023, the Court granted partial summary judgment in favor of the United States.  The Court found that Plaintiff was a "responsible person" under § 6672 for RCS's unpaid trust fund taxes for the fourth quarter of 2017 and first and second quarters of 2018. (Docket No. 43.)  The sole remaining issue to be decided is whether Plaintiff acted "willfully" for purposes of § 6672.

The Court sitting without a jury makes following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

**I.    Findings of Fact**

1.    Plaintiff was a board member of RCS from October 23, 2015 through approximately February of 2019.  Plaintiff was also the Chairperson of RCS from October 28, 2015 to July 5, 2018.  As the Chairperson, Plaintiff had contractual and banking powers. (Docket No. 77, section 5 (Stipulated Facts ("SF")) ¶¶ 5–8, 50, 53; Ex. 3 at P025418–19.)

2.    On January 1, 2017, KLD LLC, a California LLC of which Plaintiff was the sole member, entered into a "Management Services Agreement" ("Agreement") with RCS. Pursuant to the Agreement, RCS appointed KLD LLC to act as its "sole and exclusive manager," and "representative ADVISOR in all matters including but not limited to entering advice, guidance, counsel, directions and other services needed by the company" including "provid[ing] [o]verall executive management" and "provid[ing] [f]inancial and operational management and oversight."  (SF ¶¶ 11–15.)  RCS ended its contract with KLD LLC around December 18, 2018.  (SF ¶ 52.)

3.    Gary Carroll ("Carroll") was the RCS business manager from approximately December of 2017 through February of 2018.  (SF ¶ 23.)

4.      Michael Nolan ("Nolan") provided coaching, consulting, and training services for RCS from approximately October of 2017 through May of 2018.  (Ex. 48 (Designated Deposition Testimony of Michael Nolan) at pp. 40–41, 44–45.)

### A.      Fourth Quarter 2017

5.      RCS's tax return for the fourth quarter of 2017 shows a payroll tax liability of $26,274.57 for employee wages paid on December 29, 2017.  However, IRS records show that one of RCS's federal payroll tax deposits for the fourth quarter of 2017 in the amount of $26,474.57 was dishonored on January 4, 2018.  And RCS's bank statements for its payroll account show that a wire transfer from RCS in the amount of $26,274.57 to "IRS USA tax payments" was returned for insufficient funds on January 5, 2018.  (SF ¶ 20–22.)

6.      On January 5, 2018, Carroll informed Plaintiff that RCS's payroll account at Citizens Bank was overdrawn and that RCS's payroll tax deposit to the IRS had been returned for insufficient funds.  (Ex. 7 at P023039–42.)

7.      When asked about his January 5, 2018 emails to Plaintiff, Carroll testified as follows:  "I was informing him [Plaintiff] that we did not have sufficient funds in the Citizens Bank account to cover the payroll.  And what had happened in previous situations was that there was another account that I guess was part of Riverside Christian Schools at the Union Bank, which I had no access to whatsoever.  And so Mr. Dreyer would periodically write a check from that account to give me to deposit into the Citizens Bank account to cover expenses . . . .  So we would need for him to arrange to have money, either a check, wiring or something, from the other account that he had control over to cover that overdraft."  (Trial Tr. 61:24–62:15.)

8.      There is no evidence that Plaintiff transferred funds from RCS's account at Union Bank to cover the payroll tax payment that was returned for insufficient funds on January 5, 2018, or that the payment was eventually made.

### B.      First Quarter 2018

9.      RCS's tax return for the first quarter of 2018 shows payroll tax liabilities of $26,245.04 for wages paid on January 17, 2018, $26,521.25 for wages paid on January 31,

2018, $27,066.15 for wages paid on February 15, 2018, $50,776.19 for wages paid on March 15, 2018, and $24,903.25 for wages paid on March 31, 2018.  However, IRS records show that federal payroll tax deposits from RCS for the first quarter of 2018 were dishonored in the amounts of $26,245.04 on January 24, 2018, $26,521.25 on February 7, 2018, and $27,385.84 on February 22, 2018.  And RCS's bank statements for its payroll account show that on January 25, 2018, February 7, 2018, and February 23, 2018, wire transfers made to "IRS USA tax payments" in the amounts of $26,245.04, $26,521.25, and $27,385.84, respectively, were returned for insufficient funds.  (SF ¶¶ 32–37.)

10.     On February 8, 2018, Plaintiff sent Carroll an email with the subject line "Payroll," and wrote:  "State of California is covered.  Federal needs to be rejected and we will pay that directly to them."  (Ex. 7 at P023052.)  Carroll responded that same day:  "The bank just called me.  I thought we were going to return both the IRS and the state and that's what I told her.  I'll call her back and let her know we will cover the state and send back only the IRS draw."  (Id.)

11.     Carroll testified that he understood Plaintiff's February 8, 2018 email to mean that "[Dreyer] would give – he would take the funds out of the Union Bank account and either give me a check that we could ultimately pay the IRS or he would initiate a wire from the Union Bank account directly to the IRS."  (Trial Tr. 66:9–15.)

12.     On February 12, 2018, Carroll sent another email to Plaintiff, as well as Nolan, regarding federal payroll tax payments that were returned for insufficient funds.  The email read:  "The attached letter from the IRS is in reference to the 12/31/17 payroll tax draw that was returned.  They are asking for payment by 2/15/18.  We should be receiving two additional demand letters soon for the 1/15/18 and 1/31/18 payrolls soon.  If we don't make the payment by 2/15, additional penalties and interest will be charged.  The letter does say that we can make a partial payment and call them to work out a payment plan if you want to try and go that way."  (Ex. 7 at P023054.)

13.     On February 22, 2018, Carroll sent Plaintiff and Nolan another email, which read:  "The IRS payroll taxes pulled this morning making us $27,000 overdrawn in the

payroll account.  The state taxes will pull a little later this morning which will overdraw the payroll account an additional $3,000.  We are already short about $5,000 in the general account if everything goes through so there are currently no funds available in that to cover the payroll shortfalls.  I know the bank will be calling this morning regarding the overdrafts. Do we send the payroll tax draws back?  We currently owe the IRS $85,000 in unpaid taxes and penalties, this additional amount will run that unpaid total to $120,000.  I need to know what to tell Citizens Bank when they call me regarding the overdrafts."  (Ex. 7 at P023063.)

14.     Plaintiff replied to Carroll's February 22, 2018 email that same day, stating: "Yes we will need to pay them directly not through Citizens."  (Ex. 7 at P023063.)

15.     Carroll testified that he interpreted Plaintiff's February 22, 2018 email to mean that the payroll tax payment "would have to be paid directly out of the Union Bank account because there was not adequate funds in the Citizens Bank account."  (Trial Tr. 67:10–16.) Carroll further testified:  "So being it was the Union Bank account, there was nothing I could do.  I had no access whatsoever.  It would have to come from him.  He would have to initiate that."  (Trial Tr. 67:17–20.)

16.     On February 26, 2018, Carroll sent the following email to Plaintiff and Nolan: "We received notification from the IRS regarding returned payroll tax payment for the January 15th, 2018 payroll.  There is a $524.90 bad check penalty included so the total due is $26,769.94.  They are asking for payment by March 1, 2018."  (Ex. 7 at P023055.)

17.     Other than the dishonored wire transfers, RCS did not make any payments for its federal payroll tax liability for the first quarter for 2018, despite paying wages to its employees.  (SF ¶ 42.)

**C.     <u>Second Quarter 2018</u>**

18.     RCS's had payroll tax liabilities of $29,215.69 for wages paid on April 16, 2018, $17,470.36 for wages paid on April 30, 2018, $25,812.96 for wages paid on May 15, 2018, $20,312.07 for wages paid on May 31, 2018, and $6,379.76 for wages paid on June 15, 2018.  (Ex. 21 at USA001252.)

19.     RCS did not make any payments to the IRS for its federal payroll tax liabilities for the second quarter of 2018, despite paying wages to its employees.  (See Ex.19 at USA001240–41.)

**D.     Trust Fund Tax Penalties**

20.     After being informed by Carroll in January and February of 2018 that RCS had failed to make its federal payroll tax payments to the IRS, Plaintiff did not contact RCS's banks, or the IRS, to ensure that all payroll tax payments were made for the fourth quarter of 2017, the first quarter of 2018, or the second quarter of 2018 (collectively, the "Subject Tax Periods").  (Trial Tr. 17:18–18:3.)

21.     Plaintiff signed dozens of checks from RCS to creditors other than the United States in April, May, June, July, and August of 2018.  (SF ¶ 7; Trial Tr. 26:3–27:22; Ex. 4.) Additionally, on August 16, 2018, Plaintiff signed a bank debit transaction slip withdrawing $200,015 in funds from RCS's payroll account to purchase a $200,000 cashier's check, which was made payable to Plaintiff's single member limited liability company.  (Trial Tr. 27:13–19; Ex. 4 at P014397; Ex. 13.)

22.     On December 22, 2021, the IRS assessed tax penalties against Plaintiff for RCS's failure to pay the trust fund portion of its payroll taxes for the fourth quarter of 2017 (October 1, 2017 to December 31, 2017) and the first quarter of 2018 (January 1, 2018 to March 31, 2018).  (SF ¶¶ 1–2.)  And on January 10, 2022, the IRS assessed tax penalties against Plaintiff for RCS's unpaid trust fund taxes for the second quarter of 2018 (April 1, 2018 to June 30, 2018).  (SF ¶ 3.)

23.     On January 4, 2022, Plaintiff paid the IRS a small portion of the trust fund penalties assessed against him.  Specifically, Plaintiff paid $34.55 for the fourth quarter of 2017, $38.27 for the first quarter of 2018, and $28.71 for the second quarter of 2018.  (SF ¶ 58.)  Plaintiff also paid $111.11 for the third quarter of 2018, which was applied to his outstanding penalty balance for the fourth quarter of 2017.  (SF ¶¶ 58–59.)  Despite the allegations in the Complaint, the IRS did not assess trust fund penalties against Plaintiff for the third quarter of 2018.  (SF ¶ 4.)

24.     On January 10, 2022, Plaintiff filed claims with the IRS for refunds of the trust fund penalty payments he made on January 4, 2022 (collectively, the "Refund Claims").  (SF ¶ 58; Ex. 39.)  Around six months later, Plaintiff commenced this action, seeking the same refunds.  (Docket No. 1.)

25.     The United States then filed its Counterclaim, seeking a judgment against Plaintiff for the unpaid trust fund penalties, as well as interest and statutory additions that continue to accrue as a matter of law.  (Docket No. 18.)  As of August 8, 2023, the unpaid balances for the trust fund penalties, plus interest, were $5,123.29 for the fourth quarter of 2017, $111,546.96 for the first quarter of 2018, and $71,229.87 for the second quarter of 2018 (totaling $187,900.12).[1/]  (Ex. 41.)

26.     Plaintiff has proffered various reasons for why he mistakenly believed RCS did not have unpaid payroll taxes when he signed dozens of checks from RCS to creditors other than the United States.

27.     Plaintiff testified that, around May of 2018, the United States Department of Labor ("Department of Labor") and the California Department of Industrial Relations ("California DIR") conducted audits of RCS's payroll and payroll taxes and, "[o]nce the . . . audits were complete, a deficiency amount was set by both the federal and state agencies and releases were signed by the individual employees, RCS and the applicable Labor Department."  (Docket No. 56-1 ("Dreyer Decl.") ¶ 175; see Trial Tr. 18:8–13.)

28.     Plaintiff testified that he believed RCS did not have outstanding payroll tax liabilities due to RCS's agreement with the Department of Labor and because, in July of 2018, he was told by a representative at the Department of Labor that RCS had met its payroll tax obligations in full.  (Dreyer Decl. ¶ 183–88.)  The Court concludes that this

---

[1/]     In its revised proposed Findings of Fact and Conclusions of Law, the United States asserts that Plaintiff's outstanding trust fund penalty balance for the first quarter of 2018 was $105,680.80 and that the balance for the second quarter of 2018 was $111,546.96.  (Docket No. 81-1 ¶114.)  However, the IRS records produced by the United States (Exhibit 41) demonstrate that these numbers are incorrect and potentially the result of a typographical error in the United States' revised proposed Findings of Fact and Conclusions of Law.

testimony is not credible.  Notably, Plaintiff has provided no supporting evidence, i.e., records or witnesses from the Department of Labor.  Additionally, Plaintiff did not mention the Department of Labor, California DIR, or any audit or agreement between RCS and those agencies in his Refund Claims or in his Federal Rule of Civil Procedure 26(f) initial disclosures.  (Trial Tr. 6:12–23, 37:6–38:8; Ex. 39; Ex. 43.)  Moreover, Amanda Dudley, a Litigation Technical Advisor for the IRS, testified that the Department of Labor's audit and resulting agreement with RCS do not relate to the Subject Tax Periods or the tax penalties assessed against Plaintiff for those periods.  (Trial Tr. 78:20–23, 82:7–11; see also Docket No. 55-1 ("Dudley Decl.") ¶¶ 10, 12.)

29.    Plaintiff also testified that he believed RCS had no outstanding payroll tax liabilities because he instructed Carroll and Nolan to pay RCS's payroll taxes, and because Carroll and Nolan informed him the payroll taxes had been paid.  (Dreyer Decl. ¶¶ 89–92, 113; Trial Tr. 18:1–4.)  The Court does not find this testimony to be credible.  As an initial matter, Plaintiff did not mention Carroll or Nolan in his Refund Claims.  (Ex. 39.)  Additionally, both Carroll and Nolan's testimony contradicts that of Plaintiff.  Nolan stated at his deposition that Plaintiff never instructed him to pay RCS's outstanding federal payroll taxes, and Carroll testified at trial that he never told Plaintiff that RCS's payroll taxes were fully paid after the insufficient wire transfers.  (Trial Tr. 68:13–16; Ex. 48 (Designated Deposition Testimony of Michael Nolan) at p. 61.)  Carroll also testified that he could not have paid the outstanding taxes when RCS's payroll bank account was overdrawn because he did not have access to RCS's account at Union Bank.  (Trial Tr. 61:24–62:15, 67:13–20.)  Rather, Plaintiff had access to that account.  (Trial Tr. 63:15–22.)

30.    Plaintiff also asserts that he believed RCS had no outstanding payroll tax liabilities because he reviewed some of RCS's financial reports, which indicated that RCS's payroll tax payments were being made to the IRS.  (Dreyer Decl. ¶ 115; see Exs. 23–25, 28–29.)  The Court does not find this testimony credible because Plaintiff admitted at trial that the financial reports he reviewed did not contain a complete list of RCS's creditors.  (Trial Tr. 33:8–36:9.)

31.     Plaintiff further asserts that he believed RCS's outstanding payroll taxes had been paid because RCS received $500,000 in funding in March of 2018.  (Dreyer Decl. ¶¶ 113–14.)

32.     Finally, Plaintiff contends that he believed RCS did not have outstanding payroll taxes because RCS's tax returns for the Subject Tax Periods show a payroll tax balance due of zero dollars.  (See Docket No. 82 at p. 2; Trial Tr. 82:16–83:8.)  However, the Court finds the balances listed on the tax returns are not accurate; rather, RCS incorrectly reported the amount of federal payroll taxes that it had paid for the Subject Tax Periods. (See Trial Tr. 83:11–20.)

## II.     Conclusions of Law

1.     The Internal Revenue Code requires employers such as RCS to withhold federal social security and income taxes from the wages of its employees.  See 26 U.S.C. §§ 3102(a), 3402(a).  Although an employer collects this money each salary period, payment to the federal government takes place on a quarterly basis.  In the interim, the employer holds the collected taxes in "a special fund in trust for the United States."  26 U.S.C. § 7501(a). These taxes are known as "trust fund taxes."  See Slodov v. United States, 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978).

2.     If an employer fails to pay the United States its collected trust fund taxes, "the officers or employees of the employer responsible for effectuating the collection and payment of trust fund taxes" can be held personally liable for the delinquent taxes under 26 U.S.C. § 6672 ("Section 6672" or "§ 6672").  Id. at 244–45.  To impose personal liability, § 6672 requires that an individual (1) was "required to collect, truthfully account for, and pay over" the taxes (commonly known as a 'responsible person') and (2) "willfully failed to meet one or more of these obligations." Nakano v. United States, 742 F.3d 1208, 1211 (9th Cir. 2014) (internal quotations omitted).

3.     In an action to collect taxes, the government bears the initial burden of proof. Jones v. United States, 60 F.3d 584, 589 (9th Cir.1995).  However, because there is a "presumption of correctness" applied to tax assessments, the government can satisfy its

burden by producing IRS Certificates of Assessment and Payments.  Palmer v. U.S. I.R.S., 116 F.3d 1309, 1312 (9th Cir. 1997); see also von Bernuth v. United States, No. CV 09-6688-JST (PLAx), 2010 WL 11596154, at *3 (C.D. Cal. Nov. 8, 2010) (explaining that "the Government established a prima facie case by submitting Certificates of Assessment against [the plaintiff] for the § 6672 penalties").

4.     The burden then shifts to the individual against whom a tax penalty assessment is made "with respect to both [the individual's] own claim and the government's counterclaim."  Oliver v. United States, 921 F.2d 916, 919 (9th Cir. 1990).  The individual must prove by a preponderance of the evidence that they are not a "responsible person" or that they did not act "willfully" under section 6672.  See United States v. Jones, 33 F.3d 1137, 1139 (9th Cir.1994).

5.     The United States has produced IRS Certificates of Assessment and Payments demonstrating that the IRS assessed trust fund penalties against Plaintiff for the Subject Tax Periods.  (Exs. 18, 40; see also Docket No. 43 at p. 4.)  Additionally, the Court has determined as a matter of law that Plaintiff is a "responsible person" under § 6672.  Accordingly, the remaining legal issue for the Court to decide is whether Plaintiff has demonstrated, by a preponderance of the evidence, that he did not willfully fail to pay RCS's trust fund taxes for the Subject Tax Periods.

6.     The Ninth Circuit defines "willfulness" within the meaning of § 6672 "as a voluntary, conscious and intentional act to prefer other creditors over the United States."  Davis v. United States, 961 F.2d 867, 871 (9th Cir.1992) (internal quotations omitted).

7.     An action may be willful without any "intent to defraud the government" or "bad motive," and "conduct motivated by a reasonable cause may nonetheless be willful." Id.  "If a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses, even to meet the payroll out of personal funds he lends the corporation, our precedents require that the failure to pay withholding taxes be deemed 'willful.'"  Phillips v. United States, 73 F.3d 939, 942 (9th Cir. 1996).

8.      "'[R]eckless disregard' of whether the taxes are being paid over, as distinguished from actual knowledge of whether they are being paid over, may suffice to establish willfulness." Id. at 942; see Matter of York, 78 F.4th 1074, 1095 (9th Cir. 2023) ("[F]or nonpayment to be willful there must be either knowledge of nonpayment or reckless disregard of whether the payments were being made.") (internal quotations omitted).  That is, even in the absence of express knowledge, a "responsible person" who pays creditors other than the government can be liable if they (1) "clearly ought to have known" that (2) "there was a grave risk that withholding taxes were not being paid" and (3) were "in a position to find out for certain very easily." Phillips, 73 F.3d at 943 (internal quotations omitted); see York, 78 F.4th at 1095 ("A rational trier of fact could conclude from this evidence that York 'preferred ignorance,' and that he acted in reckless disregard of whether the payroll taxes were being paid over to the IRS . . . . [A] reasonable factfinder could further conclude that, once York acquired actual knowledge that the taxes were not being paid, he willfully failed to take any steps to pay them or to see that they were paid.") (internal quotations and citations omitted).

9.      "Once a responsible person gains knowledge of a payroll tax deficiency, he is liable for all periods during which he was a responsible party, regardless of whether those periods precede or follow the date he gained that knowledge." Savona v. United States, No. 06CV1365 IEG (WMc), 2007 WL 3034456, at *8 (S.D. Cal. Oct. 15, 2007) (internal quotations omitted).

10.     Here, Plaintiff has not demonstrated, by a preponderance of the evidence, that he did not have actual knowledge of RCS's unpaid payroll taxes when he paid creditors other than the United States.

11.     Additionally, Plaintiff has not demonstrated that he did not act with "reckless disregard" when he paid creditors other than the United States while RCS had outstanding payroll tax liabilities.  Rather, after receiving Carroll's emails in January and February of 2018, Plaintiff clearly ought to have known that there was a grave risk that RCS's trust fund

1   taxes were not paid and, as the Chairperson of RCS, he was in a position to very easily find
2   out.

3        12.    After learning that RCS's payroll tax payments to the IRS were returned for
4   insufficient funds, Plaintiff did not ensure that the outstanding trust fund taxes were paid
5   before signing checks to creditors other than the United States in April through August of
6   2018.  Notably, Plaintiff did not contact RCS's banks or the IRS to determine whether the
7   payroll taxes for the Subject Tax Periods were being paid.  Nor is there any credible
8   evidence that he asked Carroll or Nolan about the status of the payments to the IRS after
9   receiving the emails from Carroll in January and February of 2018.

10        13.    The Court has concludes that the majority of Plaintiff's purported reasons for
11   believing that RCS had no outstanding payroll taxes are not credible.  Moreover, the Ninth
12   Circuit has held that "[a] mistaken belief on the part of the responsible person that the tax
13   need not or cannot be paid over does not suffice to render the failure to pay nonwillful."
14   Teel v. United States, 529 F.2d 903, 906 (9th Cir. 1976); see also Buffalow v. United States,
15   109 F.3d 570, 573 (9th Cir. 1997) (affirming district court's determination that a responsible
16   person acted willfully despite the fact that he mistakenly believed he could pay creditors
17   other than the IRS while his company had outstanding payroll taxes).

18        14.    Plaintiff also contends that he believed RCS had no outstanding payroll tax
19   liabilities because RCS received $500,000 in funding in March of 2018, and because RCS's
20   tax returns for the Subject Tax Periods do not indicate an outstanding balance of taxes due.
21   However, these mistaken beliefs do not establish a lack of willfulness.

22        15.    The Court finds that Plaintiff has failed to meet his burden to prove, by a
23   preponderance of the evidence, that he did not willfully fail to pay RCS's trust fund taxes to
24   the IRS for the Subject Tax Periods.  Accordingly, Plaintiff is liable for the trust fund
25   penalties that the IRS assessed against him.  As of August 8, 2023, the penalties, including
26   interest, amounted to $187,900.12 ($5,123.29 for the fourth quarter of 2017, $111,546.96 for
27   the first quarter of 2018, and $71,229.87 for the second quarter of 2018).

28

1

**<u>Conclusion</u>**

2     For all of the foregoing reasons, the Court concludes that the United States is entitled

3 to a Judgment in its favor on Plaintiff's claim for refund.  The Court further concludes that

4 the United States is entitled to a Judgment on its counterclaim for payment of the

5 outstanding trust fund penalties assessed against Plaintiff in the amount of $187,900.12, plus

6 interest and statutory additions as provided by law.  The Court will issue a Judgment

7 consistent with these findings of fact and conclusions of law.

8     IT IS SO ORDERED.

9

10  DATED:  December 18, 2023     _____

11                               Percy Anderson
                                 UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28